**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

JERRY J. HERRON,                                     No. CIV S-07-0465-CMK

        Plaintiff,

    vs.                                          <u>MEMORANDUM OPINION AND ORDER</u>

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

_____/

        Plaintiff, who is proceeding with retained counsel, has filed an action for judicial review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g). Pursuant to the consent of the parties, this case is before the undersigned for final decision on plaintiff's motion for summary judgment (Doc. 22) and defendant's cross-motion for summary judgment (Doc. 28).

/ / /

/ / /

/ / /

/ / /

1

# I.  PROCEDURAL HISTORY

Plaintiff applied for social security benefits on March 17, 2000.  In his application, plaintiff claims that disability began on September 27, 1995.  Plaintiff claims his disability consists of a combination of:  "major depression, recurrent with possible psychotic features; hypertension; back pain; diabetes; and Hep C."  He also alleges he suffers from the "residual effects of a skull fracture" and a "chip fracture . . . involving the anterior superior portion of C5."  According to plaintiff, these impairments are severe and result in chronic pain, anxiety, irritability, and difficulty concentrating.

Plaintiff's claim was initially denied.  Following denial of his request for reconsideration, plaintiff requested an administrative hearing, which was held on May 9, 2002, before Administrative Law Judge ("ALJ") Barry Wesker.   In his July 24, 2003, decision, the ALJ made the following findings:

> 1.   The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through December 31, 1998;
>
> 2.   The claimant has not engaged in substantial gainful activity since the alleged onset of disability;
>
> 3.   Through December 31, 1998, the claimant has the following medically determinable impairment(s):  hypertension;
>
> 4.   Through December 31, 1998, the claimant did not have any impairment or impairments that significantly limit his ability to perform work-related activities; therefore, the claimant does not have a severe impairment. . .; and
>
> 5.   The claimant was not under a "disability" as defined in the Social Security Act, at any time through December 31, 1998. . . .

After the Appeals Council declined review on March 26, 2004, plaintiff filed an action in this court for judicial review, which was assigned case number CIV-S-04-0964-DFL-CMK.  The parties stipulated to a remand and, on April 14, 2005, the court vacated the prior administrative decision and remanded the case for further proceedings.  Pursuant to the parties' stipulation and

subsequent Appeals Council October 31, 2005, remand order, the ALJ was required to:

1.    Consider the period at issue from the date of the prior reconsideration determination dated July 15, 1994, until the date last insured of December 31, 1998;

2.    Obtain any available records from Dr. M.B. May, documenting the efforts to obtain these records in the administrative record;

3.    Give consideration to the examining opinions of record pursuant to the provisions of 20 C.F.R. § 404.1527 and Social Security Rulings 96-2p and 96-5p and non-examining source opinions, including that of M. Mehrkhast, pursuant to the provisions of 20 C.F.R. § 404.1527(f) and Social Security Ruling 96-6p, and explain the weight given to such opinion evidence; as appropriate, the Administrative Law Judge may request the examining sources to provide additional evidence and/or clarification of the opinion. . .;

4.    Further evaluate the claimant's subjective complaints and provide rationale in accordance with the disability regulations pertaining to evaluation of symptoms. . .; and

4.    Obtain evidence from a psychiatric medical expert.

On remand, a second hearing was held on February 7, 2006.  In his second decision, the same ALJ made the following findings with respect to the time period from July 15, 1994, through December 31, 1998:

1.    The claimant met the disability insured status requirements of the Act on July 15, 1994, and continues to meet them through December 31, 1998;

2.    The claimant has not engaged in substantial gainful activity since July 15, 1994;

3.    For the period from July 15, 1994, through December 31, 1998, the evidence does not demonstrate the presence of a medically determinable impairment persisting at least 12 continuous months;[1]

/ / /

/ / /

_____

[1]    Specifically, the ALJ concluded that there was an absence of medical evidence to establish any impairment during this period.  This finding is not inconsistent with the prior decision.  While the ALJ previously concluded that "[t]hrough December 31, 1998, the claimant has the following medically determinable impairment(s):  hypertension," he stated in the body of the prior decision that "from September 1995 through December 1998 . . . the medical evidence fails to demonstrate a severe impairment persisting at least 12 continuous months."  Thus,

4.    During the relevant time period the evidence does not document the presence of medical signs and laboratory findings which would demonstrate the presence of a medical impairment(s) which could reasonably be expected to produce the claimant's pain and other alleged symptoms, including his statements that he could not work due to headaches, depression, hypertension, back problems, diabetes, irritability, inability to concentrate, occasional suicidality, inability to tolerate stressful situations, remain in certain positions for any period of time without pain, or the other subjective complaints provided in his testimony and pre-hearing documents;

5.    During the period from July 15, 1994, through December 31, 1998, the claimant did not have any impairment or combination of impairments which significantly limit his ability to perform basic work-related activities for a period of at least 12 continuous months; therefore, the claimant did not have a severe impairment. . .; and

6.    The claimant was not under a "disability" as defined in the Social Security Act, at any time between July 15, 1994, and December 31, 1998.

After the Appeals Council denied further review, this action followed.


## II.  SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains medical records from the following sources:[2]  (1) records from Northbay Medical Center covering the period from December 1984 through July 1997 (CAR113-59); (2) records from Vaca Valley Hospital covering the period from February 1995 through December 1999 (CAR 160-72); and (3) letter dated June 29, 1998, from Van A. Pena, M.D., Medical Director, Correctional Health Care Services.  All other records contained in the CAR relate to plaintiff's medical condition outside the relevant time period.

///

///

///

---

[2]    The court will focus only on those records documenting the relevant period – July 15, 1994, through December 31, 1998.  Records outside this period are discussed for background purposes.  As to the relevant period, the ALJ indicates in the current hearing decision that plaintiff was incarcerated between February 1995 and December 1999.

1

<u>1991</u>

2          Dr. Steven Suga, M.D., conducted a neurological examination and prepared a

3   report on October 11, 1991, in relation to headaches plaintiff claimed resulted from a work injury

4   he sustained while working at Napa State Hospital.  Dr. Suga reported the following history:

5                Mr. Herron is a 36 year old black male, who was struck by a patient at the
             state hospital in 1988.  The patient sustained a hairline fracture of the right
6             frontal area.  The headaches seemed to start around that time.  Prior to that
             the patient did not experience many headaches.  The headaches first
7             occurred 2-3 times per year and last year he had one every other month.
             For the last 2-3 months he has been getting sharp shooting pain every other
8             day over the right frontal area and above the eyes on both sides.  No
             nausea or vomiting.  Occasional photophobia was noted.  He described the
9             headache as throbbing type and usually it is not a sick headache.  Stiffness
             is mild.  The patient denied any numbness, tingling, paralysis, or speech
10            disturbance with the headache.  The patient does not have any dizziness
             but sometimes blurred vision is associated with the headache, particularly
11            during the headache.  No flickering of lights or stars are seen but
             occasionally, wor[m] like movements are seen in the visual field.

12

13   Results of physical and mental status examinations were unremarkable.  Dr Suga diagnosed a

14   combination of migraine headache and muscle tension headache and recommended medication.

15                <u>1992</u>

16          Plaintiff was seen by Dr. Suga again in January 1992 for headaches.  Dr. Suga

17   reported the following on physical examination:

18                The patient is alert and oriented.  Blood pressure 120/88.  Pulse rate 74,
             regular sinus rhythm.  Weight is 210 lbs.  Ocular fundi show no
19            papilledema on either side.  There is no scalp tenderness, but the patient
             has tenderness along the greater occipital nerve, more so on the left side.
20            There is marked rigidity of the neck muscles on both sides, more so on the
             left side.  The range of neck motion is moderately limited and [his] neck is
21            rigid to flexion.  Paraspinal muscle is mildly tender on both sides.

22   Dr. Suga diagnosed muscle contraction headache and recommended switching medication.

23          In September 1992, plaintiff was examined by Patricia Wiggins, M.D., who

24   assessed migraine headache and a "spaced out feeling."  She recommended further evaluation

25   and testing by a neurologist.

26   / / /

<u>1993</u>

In April 1993, Daniel Ferrick, M.D., reported on plaintiff's subjective complaints of stress. While there is no indication that Dr. Ferrick performed any kind of mental status examination, he assessed "stress disorder," apparently based solely on the plaintiff's subjective complaints. Dr. Ferrick recommended treatment by a psychologist and prescribed Valium.

Dr. Ferrick also reported on plaintiff's headaches in April 1993. Findings on physical examination were unremarkable. Dr. Ferrick assessed tension headache exacerbated by stress at home. He prescribed medication.

In May 1993, plaintiff was seen again by Dr. Wiggins. She conducted a physical examination, the results of which were unremarkable. While she apparently did not conduct any psychological testing, she assessed "agitated depression."

On July 1, 1993, Dr. Ferrick "filled out the disability form" although he said he would rather a psychiatrist or psychologist "do this as it really is a psychological problem that we are dealing with." Plaintiff was started on Paxil for depression and the prescription for Valium was renewed. On July 27, 1993, Dr. Ferrick noted that plaintiff's blood pressure was 126/98 "in the left arm sitting." He assessed hypertension. On August 16, 1993, blood pressure was 140/90. Dr. Ferrick again assessed hypertension. On September 21, 1993, Dr. Ferrick reported that plaintiff's blood pressure was 124/90 and assessed hypertension "fairly well controlled on Calan."

According to plaintiff, he was seen by psychologist Mertson B. May, M.S., in October 1993, at which time he was diagnosed with generalized anxiety disorder, but that plaintiff had recovered with rehabilitation. The ALJ was unable to obtain any additional records from this source because Dr. May was deceased as of the date of the second hearing.

/ / /

/ / /

/ / /

1    1994

2    As to plaintiff's medical condition in 1994, the CAR does not appear to contain

3    any medical records for this year. According to plaintiff, the following summarizes 1994:

4    In June 1994, Mr. Herron was diagnosed with a generalized
     anxiety disorder by Dr. May. MMPI testing in November of 1994 by Dr.

5    May showed Mr. Herron had some moderate degree of depression. He
     showed extreme "cry for help" pattern on the testing, "he felt he needed

6    some support because he was still feeling stressed out in 1994."

7    Plaintiff admits that "[t]his information was derived from a chronology of medical evidence

8    completed by Social Security, the hearing decisions, and the prior transcript of the hearing." In

9    the prior hearing decision, the ALJ summarized records for 1994 as follows:

10   . . . Testing in November 1994 showed moderate depression, though Dr.
     Campos testified that he does not believe the test results were valid.

11

12   Dr Campos was a medical expert who testified at the first administrative hearing. There is no

13   citation to any portion of the record accompanying this statement. In the current decision, the

14   ALJ adds the following for 1994:

15   . . . A December 2, 1994, report from Andrew Whyman, M.D., indicates
     the claimant underwent recent psychiatric consultation with the conclusion

16   that he was presently experiencing a "mild, basically non-disabling
     depressive disorder. . . ." (Exs. 39, 40/14, prior file).

17

18   The CAR does not contain any evidence of objective testing to support plaintiff's summary for

19   1994.

20   1995

21   As with 1994, there are scant records from 1995. Plaintiff provides the following

22   summary:

23   In 1995, Dr. Winter tested Mr. Herron, noted all the previous
     diagnoses and felt that he did have a depressive disorder. A couple of the

24   ratings of Mr. Herron's functionality were in the moderate impairment
     range, most were in the light impairment range.

25   On September 11, 1995, Mr. Herron received ER treatment at Vaca
     Valley Hospital. He was diagnosed as suffering from chronic intermittent

26   left shoulder and knee pain, and chronic low back pain. . . .

7

The ALJ offered the following statement in the prior decision regarding 1995:

> . . . In 1995, Dr. Winter tested him and noted all the previous diagnoses and felt he did have a depressive disorder.  However, all the ratings of his functionality were mostly in the slight impairment range.

Plaintiff again admits that his summary is based only on the prior hearing testimony, an agency summary, and the ALJ's earlier hearing decision.

The record does indicate that plaintiff reported to the emergency room at Vaca Valley Hospital on October 18, 1995, following a fall from a ladder.  The doctor reported the following history:

> Patient complains of having a fall 7 feet with an injury to the head, buttock approximately 30 minutes prior to arrival.  There also was direct blow from  tire rim which shifted on truck he was loading and hit him . . . which caused him to fall from ladder which happened at the same time with no loss of consciousness.  There has been no dizziness.  There has been no nausea and vomiting.  There has been no blurred vision.  There has been no confusion since the injury.
>
> While falling he struck buttock on part of ladder causing laceration to buttock right.  No other complaints.

The emergency room report notes "high blood pressure" but  that "[a]ll other systems negative."  The laceration was closed with sutures.

<u>1997</u>

James B. Bronk, M.D., reported on x-rays taken of plaintiff's back on July 14, 1997.  Dr. Bronk reported:  "Stable changes involving C5 without evidence for acute skeletal abnormalities."

<u>1998</u>

In his June 29, 1998, letter, Dr. Pena, states that he examined plaintiff on June 25, 1998, "to assess Mr. Herron's ability to work and participate in a drug treatment program."  Dr Pena reported the following in his letter:

> Mr. Herron dates his medical problems to an alleged assault by a patient at Napa State Hospital.  The workman's compensation first report described "Patient punched him on the right hand side of the face" and was dated

September 26, 1991, although the injury allegedly occurred in 1988 or 1989.

He has complained of headaches since this injury.  There was said to be a hairline skull fracture, which resulted from the blow to the head (report by Dr. Ferrick, October 11, 1991).  Mr Herron has also had problems with his back and neck, all attributed to work injuries over a range of time from 1990, 1991, and 1992.  There have been problems at home and Mr. Herron apparently believes his work problems and injuries have "destroyed his family life" (May 24, 1993, report by Dr. Ferrick).  Mr. Herron apparently was accused of sexual impropriety with a female patient at Napa State Hospital (approximately 1990) and the stress of this accusation and subsequent loss of his job as psychiatric technician at Napa State Hospital further added to his complaints of headache, neck, and back pain.
All of the physical examinations including neurologic examinations recorded in the reviewed records, are normal.  Family practitioners, a neurologist, psychologist, and a psychiatrist have evaluated Mr. Herron.  Mr. Herron has received a number of medications including antidepressants, analgesics of various types, medication for dizziness, and medications usually used to treat migraine.  Dr. William Winter pronounced a diagnosis of depressive disorder in his extensive evaluation dated August 24, 1994.  The data does not imply that the various therapies offered Mr. Herron, including medication, have benefitted Mr. Herron.

My physical examination of June 25, 1998, was normal.  I see no physical reason Mr. Herron cannot work.  From a physical perspective, Mr. Herron has no injury, defect, or condition which would limit his ability to perform work, including physical labor.

I asked Mr. Herron if he could work.  He answered, "If they send me, I will go."  Mr. Herron also stated that if he were required to work he would probably be injured, and he expressed fear at sustaining any injury while working.  He stated that he believed he could not work, and if required to work that he would fail, and would be returned back to jail.  Mr. Herron stated that he was rated disabled (August 28, 1994, report by Dr. Winter, Ph.D.) and his condition is "permanent and stationary."  Mr. Herron said that it is unfair to require him to work.  Mr. Herron stated that he wants to go to a hospital where he can receive therapy.  Mr. Herron believes he should receive vocational rehabilitation to learn new job skills.

I believe Mr. Herron is not emotionally or mentally prepared to work and that, if required to perform labor, that he will indeed fail as he predicts.

There is no indication in the record that Dr. Pena conducted any psychological testing of his own.

/ / /

/ / /

/ / /

9

On July 29, 1998, plaintiff was treated at the Veterans Administration Medical Center in San Francisco following a work injury.  The attending physician noted that plaintiff complained of a back injury sustained in 1989 while trying to restrain a combative patient.  The doctor reported that plaintiff re-injured his back in 1992.  The current visit to the emergency room was prompted after plaintiff "felt a 'pop'" while leaning over to pick something up.  Plaintiff complained of bilateral lower back pain.  Plaintiff reported to the doctor that he believes he is totally disabled because of "weak back."  The doctor observed "lots of subjective distress."  On physical examination, the doctor noted "exquisite paraspinus muscle tenderness though no clear spasm" and "no spinal tenderness."  The doctor reported "5/5 strength in [leg extensions]" and "overwhelmingly positive [straight leg raises] bilaterally."

<u>2000</u>

A letter dated March 16, 2000, from Nancy B. Lazarus, M.D., of the Department of Veterans Affairs states:

> Mr. Jerry Herron is under treatment for hypertension, hepatitis C infection, chronic neck and low back strain, and depression.  At present, he is totally disabled.  He needs re-evaluation in 6 months.

On May 29, 2000, Benjamin Fritz, M.D., performed  a comprehensive internal medicine examination and prepared a report.  At the time, plaintiff's complaints were depression and low back pain.  Dr. Fritz diagnosed:  (1) depression; (2) low back pain; (3) hypertension; and (4) hepatitis C.  As to plaintiff's functional capabilities, Dr. Fritz opined:

> Based on the objective evidence of the examination, the number of hours that the claimant could be expected to stand and walk in an eight-hour workday with normal breaks is at least six hours.  The claimant has no obvious limitations to standing and walking from his minimal back discomfort.
>
> The number of hours that the claimant could be expected to sit in an eight-hour workday is unrestricted.  The claimant does not require the use of an assistive device for ambulation.
>
> The amount of weight that the claimant could lift and carry is 10 pounds frequently and 20 pounds occasionally.

> The claimant has no postural limitations.  He could bend and stoop on a frequent basis without significant difficulty.  The claimant has no manipulative limitations and has no relevant visual or communicative limitations.
>
> The role of the claimant's depression in a workplace setting would best be evaluated by a psychiatrist.  However, it does not appear that his depression would significantly limit his participation in a workplace setting.

In June 2000, agency psychiatrist Harinder S. Auluck, M.D., reported on psychiatric evaluation.  Dr. Auluck diagnosed major depression, recurrent and assigned a global assessment of functioning ("GAF") rating of 65 out of 100.  As to present daily activities, Dr. Auluck reported:

> The claimant spends time in the homeless shelter.  He does attend some activities.  He does not have to worry about shopping, cooking, and housekeeping as he has no funds to purchase these necessities and obtain[s] these necessities from social services run homeless shelter.

Dr. Auluck concluded that plaintiff was capable of performing simple tasks, but that he would have difficulty maintaining regular attendance or perform work on a consistent basis.  The doctor also opined that auditory hallucinations would interfere with completion of work without interruption.  Dr. Auluck's prognosis was guarded.

## III.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones

1   v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's

2   decision simply by isolating a specific quantum of supporting evidence.  See Hammock v.

3   Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative

4   findings, or if there is conflicting evidence supporting a particular finding, the finding of the

5   Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

6   Therefore, where the evidence is susceptible to more than one rational interpretation, one of

7   which supports the Commissioner's decision, the decision must be affirmed, see Thomas v.

8   Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

9   standard was applied, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

10

11                                    **IV.  DISCUSSION**

12              In his motion for summary judgment, plaintiff argues:  (1) the ALJ failed to

13   develop the record by obtaining "known relevant medical records from Dr. May," plaintiff's

14   treating psychologist; (2) the ALJ failed to develop the record regarding the onset date of

15   disability; (3) the ALJ erred in finding that plaintiff did not have any severe impairment; and

16   (4) the ALJ erred in concluding that plaintiff's testimony regarding the nature and extent of his

17   impairment and functional limitations was not credible.

18         **A.      <u>Severity Determination</u>**

19              Plaintiff argues that the ALJ erred in concluding that he did not have severe

20   impairments.  Specifically, he focuses on back pain, depression, hypertension, and hepatitis C.

21   As to physical and mental impairments, the ALJ concluded that the evidence was insufficient to

22   establish any severe impairment lasting continuously for 12 months during the relevant time

23   period from 1994 through 1998.  Specifically, the ALJ stated:

24              In conclusion, while there are considerable medical records demonstrating
               the presence of various severe medical and mental disorders for the period
25              prior to May of 1994 and subsequent to December of 1998, there are
               virtually no records documenting the presence of any medically
26              determinable physical or mental impairment during the relevant time

period.  Given the volume of the records for the period before an[d] after the relevant time period, there is a strong inference that during the pertinent period the claimant was functioning sufficiently and without any significant physical or mental impairment requiring him to undergo any examination or treatment. . . .[3]

The undersigned therefore concludes that the evidence is insufficient to establish the presence of a severe medically determinable impairment lasting at least 12 continuous months for the period between July 15, 1994, and December 31, 199[8]. . . .

In order to be entitled to benefits, the plaintiff must have an impairment severe enough to significantly limit the physical or mental ability to do basic work activities.  See 20 C.F.R. §§ 404.1520(c), 416.920(c).[4]   In determining whether a claimant's alleged impairment is sufficiently severe to limit the ability to work, the Commissioner must consider the combined effect of all impairments on the ability to function, without regard to whether each impairment alone would be sufficiently severe.  See Smolen v. Chater, 80 F.3d 1273, 1289-90 (9th Cir. 1996); see also 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. §§ 404.1523 and 416.923.  An impairment, or combination of impairments, can only be found to be non-severe if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.  See Social Security Ruling ("SSR") 85-28; see also Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir. 1988) (adopting SSR 85-28).  The plaintiff has the burden of establishing the severity of the impairment by providing medical evidence consisting of signs, symptoms, and laboratory findings.  See 20 C.F.R. §§ 404.1508, 416.908. The plaintiff's own statement of symptoms alone is insufficient.  See id.

---

[3]      Of course, the lack of records could also be explained by plaintiff's incarceration between February 1995 and December 1999, although plaintiff could have sought treatment while in prison if in fact he had severe impairments during this period of time.

[4]      Basic work activities include: (1) walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.  See 20 C.F.R. §§ 404.1521, 416.921.

1.    <u>Depression</u>

Regarding his depression, plaintiff argues:

> . . . With respect to Mr. Herron's depression, his treating psychologist, Dr. May, reported to Social Security in 2000 that he had been treating Mr. Herron since 1992 or 1993 and that since that time Mr. Herron had experienced problems with depression and frustration.  TR 220.  A July 5, 2000 Social Security Consultation Request noted that Mr. Herron's prior file showed, among other things:

> > 12/94: 40 mins late for eval; inordinately unfocused historian; decreased sleep/appetite; moody/irritable; feels depressed most of time; MSE: speaks in disjointed way; unduly vague; mild dysphoria; cynicism; negatism; affect slightly subdued; probably depression.

> > TR 201.

That same report noted that the current file contained a 8/94 diagnosis "Depressive disorder. MSS: difficulty with con/perc/pace, maintaining attendance, handling complex work, and relating to others. Unable to do PRW as psych tech" in the current file. *Id.*

The 2002 hearing decision and testimony similarly noted that in June 1994, Dr. May diagnosed Mr. Herron with a generalized anxiety disorder and that MMPI testing in November of 1994 showed that Mr. Herron had some moderate degree of depression. TR 15, 279.  The 2002 hearing decision and testimony also noted that Dr. Winter tested Mr. Herron in 1995 and felt he had a depressive disorder.  The ALJ himself noted that a couple of Mr. Herron's functionality ratings were in the moderate impairment range, most were in the slight impairment range.  TR 15, 279-280.

In June of 1998, it was Dr. Pena's opinion based on examinations conducted between 1998 and – 1998 that Mr. Herron had no physical reason why he could not work but he concluded that "Mr. Herron is not emotionally or mentally prepared to work and that if required to perform labor that he will indeed fail as he predicts." TR 348.

In 2000, Drs. Fritz and Rosenlicht assessed Mr. Herron with depression and noted that he had a history of depression and had been impaired for a number of years.  TR 183, 192.  It was Dr. Auluck's opinion in 2000 that Mr. Herron " may not be able to complete a normal work day or normal work week without interruptions because of a *history* of auditory hallucinations as well as a *history* of lability of mood and depression." TR 188-89.  Although these opinions were rendered in 2000, they all noted that Mr. Herron had a history of depression and had been suffering for a number of years.  Dr. Fritz specifically noted that Mr. Herron's depression had started in the mid-80's and that he had been hospitalized for 14 days after attempting suicide in 1990. TR 183.

///

14

As to mental problems, the ALJ stated:

> . . . A December 2, 1994, report from Andrew Whyman, M.D., indicates the claimant underwent recent psychiatric consultation with the conclusion that he was presently experiencing a "mild, basically non-disabling depressive disorder. . . ." Between August 1994 and February 2005, the claimant also was examined in conjunction with his worker's compensation claim by H. William Winter, Ph.D. The forensic examiner opined that the claimant was experiencing a non-specific depressive disorder which was "temporarily disabling" since about mid-1993 to the present. However, the evaluation was obviously done for purposes of supporting his worker's compensation claim and not based on any treatment or medical records during the period at issue here and is of limited value and given no weight insofar as establishing the presence of a severe impairment last[ing] 12 months.

> * * *

> Likewise, with respect to the claimant's capacity for performing the mental demands of work during the relevant time period the undersigned can give no weight to the state agency's reviewing psychiatric consultant. In the June 5, 2000, medical source statement it was determined that the claimant was moderately to markedly impaired in his capacity to sustain attention and concentration, complete a regular workday, maintain regular attendance, and that he was impaired in his ability to deal with work stresses and would not be able to sustain substantial gainful activity. Again, this medical source statement was based on a recent examination long after December 1998, i.e., a June 2000 consulting psychiatric examination finding that the claimant was presently experiencing major depressive disorder and would have difficulty maintaining regular attendance in a workplace, performing work-related activities on a consistent basis, that he would need special supervision and would not be able to complete a normal workday or workweek without interruptions because of his history of hallucinations and mood lability and depression. Clearly, the claimant markedly decompensated sometime after December of 1998 but the evidence simply does not demonstrate the presence of a severe medically determinable mental impairment of at least 12 months' duration during the relevant time period.

The ALJ also commented on Dr. Pena's June 1998 letter as follows:

> . . .With regard to the June 1998 report from Dr. Pena opining that the claimant was emotionally or mentally unprepared to work it is apparent that that conclusion was based on the claimant's own assertions; "He (the claimant) stated that he believed he could not work, and if required to work that he would fail. . . . Mr. Herron said that it is unfair to require him to work." . . . Dr. Pena has provided no supporting objective medical findings that would provide any objective medical support for the assertion that the claimant could not handle the emotional or mental demands of work during the relevant time period.

15

Pursuant to the remand order, the ALJ obtained testimony from James Shoemaker, Ph.D., an

agency psychologist.  Dr. Shoemaker provided testimony at the second hearing concerning

plaintiff's mental limitations during the relevant time period.  As to Dr. Shoemaker's testimony,

the ALJ stated:

> . . . Dr. Shoemaker testified that any opinion he would have regarding the
> claimant's mental functioning for the relevant period through December
> 1998 would be based on the medical records after 1998, specifically a June
> 2000 report of psychiatric examination. . . .  In Dr. Shoemaker's opinion it
> appeared that the claimant did have a depressive syndrome. . ., based on
> impaired sleep, energy, concentration, and feelings of guilt or
> worthlessness. . . .  [T]he evidence shows mild restriction of daily
> activities, moderate restriction of social functioning, and mild deficits in
> concentration, persistence or pace.  The evidence was insufficient with
> respect to episodes of decompensation in work or work like settings.
> However, Dr. Shoemaker further testified that the evidence was
> insufficient to demonstrate the presence of a severe depressive disorder or
> other mental disorder during the relevant time period prior to December of
> 1998.

As the ALJ observed, the majority of the records relating to plaintiff's mental

problems describe his condition after the relevant time period.  Plaintiff points to essentially two

items in the record in support of his argument that his mental impairment was severe for 12

continuous months during the relevant time period.  Specifically, he notes Dr. Pena's June 1998

letter and Dr. Auluck's report from 2000 mentioning a history of auditory hallucinations and

lability.  As to Dr. Pena, contrary to plaintiff's suggestion that his assessment of plaintiff's

mental capabilities for work was based on the doctor's examinations, the record indicates that Dr.

Pena only conducted a physical examination.  There are no objective findings on mental status

examination by Dr. Pena to support his June 1998 report.  Regarding plaintiff's contention that

Dr. Auluck's opinion in 2000 is based on a history of hallucinations and lability – which, if true,

would suggest these problems existed during the relevant time period – any such "history" is

clearly based on plaintiff's subjective reporting and not the doctor's actual objective

examinations during the relevant time period.  In other words, Dr. Auluck's opinion is not based

on any history of objective findings noted between 1994 and 1998.

16

The court agrees with the ALJ that there simply is no evidence in the record to establish that plaintiff had a severe mental impairment between 1994 and 1998, let alone one that lasted continuously for 12 months.  As the ALJ observed, the absence of records indicates that plaintiff likely did not have any serious mental condition during this time period.

2.   <u>Back Pain</u>

Regarding back pain, plaintiff contends:

> With respect to Mr. Herron's back pain, the record also contained specific references to treatment received during the relevant time period for his back pain.  For example, on September 11, 1995, Mr. Herron received ER treatment at VacaValley Hospital. He was diagnosed as suffering from chronic intermittent left shoulder and knee pain, and chronic low back pain not caused by trauma. TR 167-168.  On July 14, 1997, Mr. Herron was treated by the NorthBay Medical Center ER for injuries sustained in a motor vehicle accident of the same day.  TR 113-117. A report of an X-ray exam of the same date indicated: "Three views are compared with 10-5-92 . . . Previously described either old chip fracture or ununited apopyhysis involving the anterior superior portion of C5 is noted again." TR 117.  On July 29, 1998, Mr. Herron was treated at the VA Medical Center in San Francisco for intense back pain originating the same day while he was working at the Salvation Army as part of a rehab program.  The treatment records indicated that the original back injury was sustained in 1989 when Mr. Herron was trying to restrain a combative patient.  He re-injured the same area in 1992 trying to break a patient's fall.  Mr. Herron stated: "Today, felt something pop."  The records state: "Lots of subjective distress when observed.  Exquisite paraspinous muscle tenderness." TR 162.

Again, there are virtually no records indicating that plaintiff had any serious back impairment during the relevant time period.  In fact, Dr Pena concluded in June 1998 that, on physical examination, he saw no reason why plaintiff could not work.  Dr. Bronk reported on x-rays taken of plaintiff's back on July 14,  1997, and noted:  "Stable changes involving C5 without evidence for acute skeletal abnormalities."  The treating physician at Vaca Valley Hospital did not note any complications arising from plaintiff's fall from a ladder in 1995.  While plaintiff may indeed have had a back-related impairment between 1994 and 1998, there is no evidence to indicate it was severe or lasted for a continuous 12-month period.

/ / /

3.   <u>Hypertension</u>

As to hypertension, plaintiff argues:

> In a letter dated March 16, 2000, Dr. Lazarus similarly noted: "Mr.
> Jerry Herron is under treatment for hypertension, hepatitis C infection,
> chronic neck and low back strain, and depression.  At present, he is totally
> disabled." TR 175.  It is also clear from the record, that none of these
> impairments "sprang" into existence on March 16, 2000. . . .  The record
> also documented Mr. Herron's hypertension as far back as 1993 when he
> was assessed with persistent diastolic hypertension.  TR 6.

Accepting plaintiff's argument that none of his conditions "sprang" into existence and, therefore,

that he probably suffered from hypertension during the relevant period from 1994 through 1998,

there is no evidence of clinical testing or laboratory findings which suggest that hypertension was

a severe impairment.  To the contrary, on September 21, 1993, Dr. Ferrick reported that

plaintiff's hypertension was "fairly well controlled on Calan."  There is no evidence to suggest

that the condition worsened.  The record is notably devoid of medical evidence covering the

relevant period.   Just because plaintiff was "under treatment" for a condition in 2000, and that a

condition was "persistent" in 1993, does not mean that it was severe between 1994 and 1998.

4.   <u>Hepatitis C</u>

Concerning this impairment, plaintiff states only that "according to notes by

Social Security, Mr. Herron was diagnosed with Hep C in 1998. TR 201."  Plaintiff does not,

however, provide any argument supporting his contention that the ALJ erred in concluding that

this was not a severe impairment.  As to the document at page 201 of the CAR, which is an

agency physician consultation request, there is no indication of a diagnosis in 1998 of hepatitis C.

Rather, the document indicate that plaintiff's allegations include "Hep C."  On the second page

of the document (CAR 202), the consultation request states:  "Hx of Hep C," but does not

indicate the date of diagnosis.  Based on a review of the entire record, the only other reference to

hepatitis C is in the March 16, 2000, letter from Dr. Lazarus of the Department of Veterans

Affairs who indicated that plaintiff was being treated for hepatitis C.  This letter, however, does

not indicate when hepatitis C was diagnosed.  Therefore, plaintiff has not established that

18

hepatitis C was an impairment which existed during the relevant period.  Moreover, no document

in the record indicates whether hepatitis C was severe in plaintiff's case.

**B.  Development of the Record**

Plaintiff contends the ALJ failed to develop the record as to:  (1) records from Dr.

May, his treating psychologist; and (2) onset date.   The ALJ has an independent duty to fully and

fairly develop the record and assure that the claimant's interests are considered.  See Tonapetyan

v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001).  When the claimant is not represented by counsel,

this duty requires the ALJ to be especially diligent in seeking all relevant facts.  See id.  This

requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all

the relevant facts."  Cox v. Califano, 587 F.2d 988, 991 (9th Cir. 1978).   Ambiguous evidence or

the ALJ's own finding that the record is inadequate triggers this duty.  See id.  The ALJ may

discharge the duty to develop the record by subpoenaing the claimant's physicians, submitting

questions to the claimant's physicians, continuing the hearing, or keeping the record open after

the hearing to allow for supplementation of the record.  See id. (citing Tidwell v. Apfel, 161 F.3d

599, 602 (9th Cir. 1998)).

1.   Dr. May

Plaintiff's argument, in its entirety, is as follows:

Mr. Herron's February 2006 hearing was conducted pursuant to a remand order from the Federal Court.  In the Order of Remand the Court specifically instructed the ALJ to "Obtain any available records from Dr. Merton B. May, documenting the efforts to obtain these records in the administrative record."  TR 338.  At the hearing, Mr. Herron advised the ALJ that:  "My psychologist, Dr. May, who is dead now, was at my worker's compensation hearing with me and worker's compensation should have medical records."  TR 359.  To which the ALJ responded: "Well, now it, it's a little late for that at this point in time, I'm afraid."  Id. Mr. Herron's hearing was conducted on February 7, 2006.  The hearing decision was not issued until October 26, 2006 – more than 8 months later. Yet, there is no evidence that the ALJ attempted to secure the medical records or hearing transcript from Mr. Herron's worker's compensation case – information that may have shed critical light on the period in question.  The ALJ summarily dismissed any idea of getting these records by stating it was too late.  The failure to even attempt to secure these records was especially galling considering the ALJ's finding that there was

1   no evidence of "the presence of medical signs and laboratory findings
    which would demonstrate the presence of a medical impairment(s) which
2   could reasonably be expected to produce the claimant's pain and other
    alleged symptoms" during the relevant time period.  TR 322.
3            As noted at the outset, Mr. Herron's disability was not at issue after
    1998.  However, in order for Mr. Herron to receive Social Security
4   disability benefits he had to establish that he was disabled prior to
    December of 1998.  The ALJ's failure to even attempt to secure these
5   records from Mr. Herron's worker's compensation case was clear error.
    Given the nature of the case, the state of the record, and the dictates of the
6   remand order, it was incumbent upon the ALJ to "fairly develop the record
    and to assure that the claimant's interests [were] considered."  *Smolen v.*
7   *Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996).

8   According to plaintiff's summary of his treatment records during the relevant period, plaintiff

9   was diagnosed with generalized anxiety disorder by Dr. May in June 1994.  Plaintiff does not list

10  any other treatment by Dr. May between 1994 and 1998.  Nor does plaintiff state whether Dr.

11  May opined in June 1994 that plaintiff's anxiety disorder was severe.  If indeed there were

12  records from Dr. May in plaintiff's worker's compensation file, plaintiff's attorney – who

13  represented plaintiff at the second hearing – could have either produced those records in this

14  action, or produced them to the ALJ at the second hearing.  In fact, when the ALJ stated that it

15  was "a little late for that at this point in time," plaintiff's counsel responded by saying "Okay."

16  He did not request that the record be held open so he could produce the records.  As noted above,

17  it is the plaintiff's responsibility to produce records establishing medically determinable

18  impairments.  The ALJ's duty to develop the record is only triggered where the evidence

19  produced by the plaintiff is either inadequate or ambiguous.  Such was not the case here given the

20  total lack of records produced by plaintiff.  Plaintiff's argument is even less compelling where, as

21  here, he was represented by counsel at the administrative hearing.

22          2.   Onset Date

23          As plaintiff correctly notes, where there is an indication of a disabling condition,

24  the ALJ must determine the onset date of such disability and, if the record is either inadequate or

25  ambiguous in this record, the ALJ has a duty to further develop the record.  However, in this

26  case, there was no evidence of any disability during the relevant period.  Specifically, while the

1  ALJ concluded that plaintiff was likely disabled either before or after the relevant time period,

2  there was no objective indication of any disabling condition between 1994 and 1998. In this

3  regard, Dr. Campos (who testified at the first hearing) and Dr. Shoemaker (who testified at the

4  second hearing) both testified that the evidence did not establish any disabling impairment during

5  the relevant time period. Therefore, it was not necessary for the ALJ to determine an onset date.

6         **C.     Credibility**

7                The Commissioner determines whether a disability applicant is credible, and the

8  court defers to the Commissioner's discretion if the Commissioner used the proper process and

9  provided proper reasons. See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1995). An explicit

10 credibility finding must be supported by specific, cogent reasons. See Rashad v. Sullivan, 903

11 F.2d 1229, 1231 (9th Cir. 1990). General findings are insufficient. See Lester v. Chater, 81 F.3d

12 821, 834 (9th Cir. 1995). Rather, the Commissioner must identify what testimony is not credible

13 and what evidence undermines the testimony. See id. Moreover, unless there is affirmative

14 evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not

15 credible must be "clear and convincing." See id.

16               If there is objective medical evidence of an underlying impairment, the

17 Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

18 because they are unsupported by objective medical evidence. See Bunnell v. Sullivan, 947 F.2d

19 341, 347-48 (9th Cir. 1991) (en banc). The Commissioner may, however, consider the nature of

20 the symptoms alleged, including aggravating factors, medication, treatment, and functional

21 restrictions. See id. at 345-47. In weighing credibility, the Commissioner may also consider:

22 (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent

23 testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a

24 prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and

25 (5) physician and third-party testimony about the nature, severity, and effect of symptoms. See

26 Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996) (citations omitted).

1    Plaintiff argues that the ALJ, contrary to the remand order and law outlined above,

2  made an explicit credibility finding and rejected his pain and symptom testimony "without

3  comment."  As to plaintiff's credibility, the ALJ concluded:

4        During the relevant time period the evidence does not document the
         presence of medical signs and laboratory findings which would
5        demonstrate the presence of a medical impairment(s) which could
         reasonably be expected to produce the claimant's pain and other alleged
6        symptoms, including his statements that he could not work due to
         headaches, depression, hypertension, back problems, diabetes, irritability,
7        inability to concentrate, occasional suicidality, inability to tolerate stressful
         situations, remain in certain positions for any period of time without pain,
8        or the other subjective complaints provided in his testimony and pre-
         hearing documents.
9

10  While the ALJ does not use the word "credible," he nonetheless found that plaintiff's testimony,

11  in the form of "subjective complaints provided in his testimony and pre-hearing documents," was

12  not documented by the medical evidence covering the relevant time period.  Thus, the ALJ

13  rejected plaintiff's testimony as not credible because it was unsupported by the record.

14    The court does not agree with plaintiff that the ALJ failed to comply with the

15  remand order or the law in reaching this conclusion.  First, the remand order directed the ALJ to

16  assess plaintiff's credibility, which he did.  Second, the ALJ provided a specific and legitimate

17  reasons for rejecting plaintiff's testimony – it was not supported by the evidence of record from

18  the relevant period.  The question, then, is whether the record as a whole supports the reason

19  given by the ALJ.   For all of the reasons discussed above, the court finds that the ALJ's reason is

20  well supported.   Therefore, the ALJ properly rejected plaintiff's testimony.

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

## V.  CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY ORDERED that:

      1.    Plaintiff's motion for summary judgment (Doc. 22) is denied;

      2.    Defendant's cross-motion for summary judgment (Doc. 28) is granted; and

      3.    The Clerk of the Court is directed to enter judgment and close this file.

DATED:  April 29, 2008

 

                                       _____

**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE